# EXHIBIT C

## IN THE CIRCUIT COURT OF THE SECOND JUDICIAL CIRCUIT,
## IN AND FOR GADSDEN COUNTY, FLORIDA

LINDA ORTEGA,

    Plaintiff,

vs.                                          CASE NO.:

CITY OF QUINCY,

    Defendant.

_____/

## COMPLAINT

Plaintiff, LINDA ORTEGA ("ORTEGA"), sues Defendant, the CITY OF QUINCY (the "CITY"), and alleges:

### NATURE OF THE ACTION

1. This is an action brought under Chapter 760, Florida Statutes.

2. This action involves a claim in excess of Thirty Thousand Dollars ($30,000.00), exclusive of costs and interest.

### THE PARTIES

3. At all times pertinent hereto, Plaintiff, ORTEGA, has been a resident of Florida and was employed by Defendant. Plaintiff is a member of a protected class due to her national origin. The incidents alleged herein occurred in Gadsden County.

4. At all times pertinent hereto, Defendant, the CITY, has been organized and existing under the laws of the State of Florida and conducted business in Gadsden County. At all times pertinent hereto, Defendant was an "employer" as that term is used under applicable laws identified above.

1

# EXHIBIT C

CONDITIONS PRECEDENT

5. ORTEGA has satisfied all conditions precedent to bringing this action, if any.

6. ORTEGA reserves the right and intends to amend this Complaint to include additional Counts after the exhaustion of pertinent administrative remedies.

STATEMENT OF FACTS

7. ORTEGA, a Hispanic (Mexican) female was hired by the CITY on April 25, 2017, as a Payroll/AP Clerk and served in that position until June 19, 2020.

8. ORTEGA worked under the supervision of Amanda Matthews, Accounts Payable Supervisor in the Finance Department.

9. ORTEGA received consistent satisfactory and above satisfactory performance reviews while employed by the City.

10. At the time of ORTEGA's hiring, Gloria Woodard ("WOODARD") was employed by the City as a Customer Service Representative.

11. ORTEGA was harassed and intimidated by WOODARD from the beginning and throughout her employment.

12. The harassment inflicted upon ORTEGA by WOODARD was based on ORTEGA's national origin.

13. WOODARD's conduct was severe and pervasive and created a work environment that a reasonable person would consider intimidating, hostile, or abusive.

14. During ORTEGA's employment, WOODARD used her body to physically intimidate ORTEGA by walking aggressively toward her in hallways, pushing ORTEGA her as she passed in the hallways, yelling at ORTEGA, invading ORTEGA's personal space, grabbing papers from ORTEGA's hands, calling ORTEGA "Mexican Girl," reporting ORTEGA to superiors for her dress and hairstyle, reporting ORTEGA to her superiors for the location of her parked car to imply ORTEGA was lazy,

2

# EXHIBIT C

monitoring, correcting, and questioning ORTEGA's job performance without supervisory authority implying ORTEGA was incompetent, removing items from ORTEGA's desk and work area in an effort to create the impression that ORTEGA was incompetent or insubordinate in her job, and other intimidating and offensive actions intended as a slur based on ORTEGA's national origin.

15. WOODARD's behavior intimidated ORTEGA and made her afraid for job and her personal safety.

16. WOODARD harassed and intimidated other Hispanic employees, monitored their job performance, and engaged in verbal confrontations, causing them to leave their jobs and seek other employment, which ORTEGA was aware of.

17. WOODARD's derogatory remarks relating to ORTEGA's national origin, her demeaning comments, and outright slurs, her physical contact and acts of aggression, and intimidating and threatening behavior created an intolerable employment situation for ORTEGA.

18. ORTEGA reported WOODARD's behavior repeatedly: to then-Human Resources Director Maria Francis and to then-Finance Director Ted Beason.

19. ORTEGA further reported WOODARD's behavior to Ann Sherman, who replaced Maria Frances as Human Resources Director, and who claimed she had no record of ORTEGA's prior reports and did not address ORTEGA's concerns.

20. ORTEGA reported WOODARD to then-Mayor Keith Dowdell, whose help she sought because her immediate supervisors refused to address the problem. Dowdell had been OTEGA's middle-school teacher and high school principal and ORTEGA believed she could trust him to help her. Though Dowdell did promise to help ORTEGA, he conditioned his help on engaging in a sexual relationship, which advances were unwelcomed and which ORTEGA refused. Dowdell then refused to assist ORTEGA and WOODARD's harassment and behaviors toward ORTEGA continued.

21. In July of 2019 ORTEGA met with Ann Sherman and Jack McLean to report

3

# EXHIBIT C

WOODARD's harassment yet again. McLean directed ORTEGA to choose her battles and to avoid WOODARD, which was not possible because ORTEGA's job required her to communicate with WOODARD regularly.

22. Neither McLean nor Sherman put a plan in place to address WOODARD's persistent abusive behaviors and nothing was done to address or remedy ORTEGA's complaints.

23. Instead, WOODARD was apparently rewarded or given employment perks and advantages like special training even though her position did not require it, and which training served as a basis for pay raises that ORTEGA was not given access to, and priority for overtime hours that were denied ORTEGA because she complained about WOORDARD, because the City believed WOODARD's characterizations of ORTEGA as lazy, incompetent, and insubordinate, and because she was Hispanic.

24. In early 2020, when ORTEGA announced she was pregnant, Finance Director Marcia Carty told ORTEGA that she was immediately being demoted to a part-time position, which would reduce her hours, pay, and health care insurance coverage. Carty gave no reason for the demotion other than ORTEGA's pregnancy.

25. ORTEGA refused to accept the demotion as she was in good physical health, her physician had not restricted her from doing any of her assigned work, and she continued to come to work every day.

26. During the spring of 2020, after ORTEGA announced her pregnancy and after ORTEGA refused to accept the reduction in hours, pay and benefits, WOODWARD's physical and emotional harassment and intimidation continued and even intensified.

27. WOODWARD shoved ORTEGA in the hallways at work causing ORTEGA to be in serious fear for hers and her unborn daughters' health and safety.

28. ORTEGA fears for her health and safety increased and she again reported WOODWARD's physical aggressive and intimidating behavior to her supervisors and warned them that she was considering calling the policy and would do so if WOODARD shoved her again.

4

# EXHIBIT C

29. During this time, ORTEGA had increasing anxiety and fear and concern about going to work each day and was afraid for her safety around WOODARD.

30. In early April 2020, ORTEGA passed out at work and was taken home by a City fire fighter on duty because her blood pressure was extremely low.

31. In late April 2020, ORTEGA was admitted to the hospital with pregnancy related complications and her twin daughters were born prematurely by cesarean section, and as a result of being born prematurely, the twin newborns remained in the intensive care unit at the hospital for weeks.

32. The City knew for years about WOODARD's harassment, abuse, and intimidation toward ORTEGA and repeatedly dismissed ORTEGA's complaints as petty office squabbles, establishing a pattern of conduct that permitted and allowed WOODARD to continue with her harassment, intimidation, and abuse toward ORTEGA based on ORTEGA's national origin.

33. The City made working conditions so difficult for ORTEGA that a reasonable person would feel compelled to resign, which ORTEGA did on June 19, 2020.

## COUNT I
### Discrimination On National Origin

34. Plaintiff, ORTEGA, incorporates paragraphs 1 through 33 as if fully rewritten herein.

35. This is an action against Defendant, the City, for harassment as a form of employment discrimination based on national origin.

36. Plaintiff has been the victim of discrimination on the basis of her national origin in that she was harassed, abused, and intimidated by Defendant's employee based on her national origin, denied training opportunities, overtime, and opportunities for advancement and pay raises based on her national origin, subjected to abuse and intimidation, yelling, shoving, unfounded reports of incompetence and insubordination based on her national origin, and denied any redress by Defendant after repeatedly seeking assistance from Defendant through its employees.

5

# EXHIBIT C

37. Defendant is liable for the differential treatment and hostility towards Plaintiff because it controlled the actions and inactions of the persons making decisions affecting Plaintiff or it knew or should have known of these actions and inactions and failed to take prompt and adequate remedial action or took no action at all to prevent the abuses to Plaintiff.

38. Furthermore, Defendant knowingly condoned and ratified the differential treatment to which Plaintiff was subjected as set forth in part above because it allowed this conduct and participated in same.

39. The actions of agents of Defendant, which were each condoned and ratified by Defendant, were of a national origin-based nature and in violation of the statutes referenced above.

40. The discrimination complained of herein affected a term, condition, or privilege of Plaintiff's employment with Defendant.

41. Defendant's conduct and omissions constitutes intentional discrimination and unlawful employment practices based upon national origin in violation of the statutes referenced above.

42. As a direct and proximate cause of Defendant's conduct described above, Plaintiff has suffered emotional distress, mental pain and suffering, past and future pecuniary losses, inconvenience, bodily injury, mental anguish, loss of enjoyment of life and other non-pecuniary losses, inconvenience, along with lost pay, interest on pay, and every other kind of damage allowed by law. These damages have occurred in the past, are permanent and continuing. Plaintiff is entitled to injunctive/equitable relief.

43. Plaintiff has retained the undersigned to represent her interests in this cause and is obligated to pay her a reasonable fee for her services. Defendant should be made to pay said fee and all costs associated with this case.

# EXHIBIT C

WHEREFORE, Plaintiff demands judgment against Defendant as following:

(a) that process issue and this Court take jurisdiction over this case;

(b) that this Court grant equitable relief against Defendant under the Count set forth above, mandating Defendant's obedience to the laws enumerated herein and providing other equitable relief to Plaintiff;

(c) enter judgment against Defendant and for Plaintiff awarding all legally available general and compensatory damages and economic loss to Plaintiff from Defendant for Defendant's violations of law enumerated herein;

(d) enter judgment against Defendant and for Plaintiff permanently enjoining Defendant from future violations of law enumerated herein;

(e) enter judgment against Defendant and for Plaintiff awarding Plaintiff attorney's fees and costs, where appropriate;

(f) award Plaintiff interest where appropriate; and

(g) grant such other further relief as being just and proper under the circumstances.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury on all issues herein that are so triable.

*/s/Jennifer Winegardner*
WINEGARDNER LAW
Jennifer A. Winegardner (133930)
jwinegardner@winegardnerlaw.com
Amy B. Kirkpatrick (148725)
akirkpatrick@winegardnerlaw.com
Kimberly Grippa (12357)
2852 Remington Green Circle, Suite 102
Tallahassee, FL 32308
Telephone: (850) 270-9064
Facsimile: (850) 422-0074

*ATTORNEYS FOR PLAINTIFF*